*United States v. Baker*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2017

(Argued: November 6, 2017          Decided: August 8, 2018)

No. 16-2895

_____

UNITED STATES OF AMERICA

*Appellee,*

-v.-

RAYMOND BAKER

*Defendant-Appellant.*

_____

Before:       LIVINGSTON, CHIN, *Circuit Judges*, AND KOELTL, *District Judge*.[*]

Defendant-Appellant Raymond Baker appeals from an August 18, 2016 judgment of conviction in the United States District Court for the Northern District of New York (McAvoy, *J.*).   Baker was convicted after a jury determined that he was guilty of participating in a conspiracy to distribute drugs.   Baker raises two issues in this appeal from his judgment of conviction:   First, that there was

_____

        * Judge John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

insufficient evidence to support his conviction; and second, that the district court erred in denying his request to conduct post-trial interviews of jurors. For the reasons set forth below, we conclude that Baker's arguments lack merit. Accordingly, we AFFIRM the judgment of the district court.

FOR APPELLEE:                          CARINA H. SCHOENBERGER (Michael S. Barnett, *on the brief*), Assistant United States Attorneys, *for* Grant C. Jaquith, United States Attorney for the Northern District of New York, Syracuse, NY.

FOR DEFENDANT–APPELLANT:      AMY ADELSON, Law Offices Of Amy Adelson LLC, New York, NY.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Defendant-Appellant Raymond Baker appeals from an August 18, 2016 judgment of conviction in the United States District Court for the Northern District of New York (McAvoy, *J.*). Baker was convicted after a jury determined that he was guilty of participating in a conspiracy to distribute and possess with intent to distribute more than 100 grams of heroin in violation of the Controlled Substances Act, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846, and 851. Baker raises two issues in this appeal from his judgment of conviction: First, that there was insufficient evidence to support his conviction; and second, that the district court erred in denying his request to conduct post-trial interviews of jurors. For the reasons set

forth below, we conclude that Baker's arguments lack merit. Accordingly, we affirm the judgment of the district court.

## BACKGROUND[1]

As relevant here, Baker was charged on November 5, 2015 in a single count superseding indictment with conspiring to distribute and possess with intent to distribute 100 grams or more of a mixture or substance containing heroin. The evidence presented at his trial established that between January and mid-June 2015, in Albany and Schenectady Counties, New York, Baker participated in this conspiracy with Kandi Kennedy, who testified. Over the course of the conspiracy, Kennedy sold heroin and also fentanyl to two confidential informants ("CI1" and "CI2") working for the United States Drug Enforcement Administration ("DEA") on five separate occasions; she attempted to sell heroin in a sixth transaction that ended in the arrests of both Kennedy and Baker. Kennedy testified that Baker, the father of her only child, was her supplier; that Baker personally handed the drugs over to her at her house in Schenectady; and that after each drug sale, she split the money proceeds with him, so that she kept

---

[1] The factual background presented here is derived from the testimony and other evidence presented at trial, and we view the evidence in the light most favorable to the government. *See United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015).

3

10% and Baker took the remaining 90%. The jury also heard evidence that the CIs purchased drugs from Kennedy for $110 or $115 per gram.

Kennedy testified that Baker often accompanied her when she sold heroin or fentanyl to CI1 and CI2. Four of the five completed transactions occurred in the parking lot of a shopping plaza with retail stores including T.J. Maxx and Target in Latham, New York ("Shopping Plaza"). When Baker accompanied her on a transaction, Baker and Kennedy would drive together in the same car from Kennedy's house to the Shopping Plaza. The drive took approximately 20 minutes. Upon arrival, Baker would exit the car first and wait inside the T.J. Maxx store. Meanwhile, Kennedy would meet CI1 and CI2 in the parking lot to complete the drug sale. After the sale, which usually lasted only five to ten minutes, Kennedy would meet Baker inside the T.J. Maxx before driving with him back to Kennedy's home.

In addition to Kennedy's testimony, the government presented other direct and circumstantial evidence of Baker's involvement in the conspiracy, including testimony from the two CIs and law enforcement agents, chemical forensic analyses of the controlled substances, recorded telephone calls and text messages between Kennedy and CI1 and also between Kennedy and Baker, and audio or

4

video recordings of the drug transactions. Some of this corroborating evidence is described in more detail below.

## I. The First Transaction

The first of the five completed drug transactions took place in January 2015. CI1 testified that on January 27, he called Kennedy and arranged to meet the next day so he could buy $500 worth of heroin from her. The next day, however, Kennedy told CI1 that she did not have the heroin ready because she fell asleep around 9:30 P.M. the night before, and missed a call from her supplier at approximately 10:30.[2] The only call that Kennedy received after 9:19 P.M. the night before was a call at 10:14 P.M. from Baker's number, which was forwarded to Kennedy's voicemail.

Although Kennedy was unable to supply the heroin on January 28, the transaction took place the next day, January 29, when Kennedy met with CI1 at

---

[2] In the recorded conversation, which was played for the jury, Kennedy said: "[T]hey were going drop them off last night and I fell asleep mad early I fell asleep around 9:30 and when they call at like 10:30 I was like dead . . . ." App. at 71–72, 353–54. Transcripts of this and the other recorded conversations were used as aids for the jury and are referenced herein, but jurors were properly instructed that the transcripts were not in evidence, and that the tape recordings themselves constituted the evidence.

approximately 12:00 P.M. or 1:00 P.M. and sold him 3.8 grams of a substance containing heroin.

## II.     The Second, Third, and Fourth Transactions

The next transactions followed a similar pattern and took place in February and March 2015.   In a video-recorded transaction, for instance, CI1 and CI2 met with Kennedy at the Shopping Plaza on February 16 and purchased 13.9 grams of a substance containing heroin from her.   CI1 then contacted Kennedy again on February 24 at about 4:37 P.M. and asked her to call her supplier to check the price of heroin:

> CI1:    [H]ave your people see what's the best number they can do, cause after the next one it's gonna be at least 100.
>
> . . .
>
> Kennedy:    I can check into it, but you know.
>
> CI1:    Alright, just give 'em a call real quick if they can do a little better.   Hit me right back.

App. 88–90, 363–64.   Eight minutes later, at 4:45 P.M., Kennedy called CI1 back to tell him that she was unable to reach her supplier: "I didn't get an answer, but . . . I'm sure that they're going to call me back as soon as possible."   *Id.* at 90–91, 365–66.   Kennedy's phone records, introduced at trial, reflect only one phone call during the eight-minute period in between her calls with CI1 at 4:37 P.M. and 4:45

6

P.M.—Kennedy called Baker's number at 4:39 P.M.   About two weeks later, on

March 6, Kennedy met with CI1 and CI2 at about 1:15 P.M. in the Shopping Plaza

and sold them 26.2 grams of a substance containing heroin.

The next transaction was on March 26.   Kennedy arrived at the Shopping

Plaza at approximately 1:30 P.M. in a car registered to Baker.   There, she met with

CI1 and CI2 again and sold them 27.4 grams of a substance containing fentanyl.

Less than ten minutes after Kennedy completed the sale, a law enforcement agent

observed Baker and Kennedy exiting the T.J. Maxx together.

## III.    The Fifth Transaction

On May 11, 2015 at 11:06 A.M., CI1 called Kennedy again, this time seeking

to purchase 64 grams of heroin.[3]   They discussed meeting either later that day or

the next day.   Kennedy then texted Baker: "Call my [sic] ASAP . . . Tia called . . .

Wants to see me ASAP."[4]  App. 541.   Baker called Kennedy back six minutes later

at 11:12 A.M.   The jury heard a recording of this conversation, which was

intercepted  pursuant  to  court-ordered  wiretap  surveillance  of  Kennedy's

---

[3]  In an earlier recorded conversation in April, Kennedy and CI1 had agreed to
meet at the Shopping Plaza so that Kennedy could sell CI1 14 grams of heroin.   CI1
cancelled this transaction, however, at the instruction of the DEA, when Kennedy
informed CI1 that she would only be able to meet in the evening.

[4]  Kennedy testified that "Tia" was the name she used for her buyer.

telephone communications. During the conversation, Baker queried Kennedy as to when "Tia" needed "it" and affirmed that he could "make it happen." *Id.* at 176–79, 525–26. At 11:19 A.M., within a few minutes of this conversation, Kennedy called CI1 again to confirm when CI1 would be available to meet to buy heroin from her. CI1 explained that he was not available to meet that day.

The following Monday, May 18, CI1 and Kennedy connected by phone again, and CI1 confirmed that he wanted to meet on Wednesday "in between like 12 and 1ish," and that "the jacket is a size 56," meaning that he now wished to purchase 56 grams of heroin.[5] *Id.* at 185, 530–31. Kennedy called CI1 the next day at 6:25 P.M. to tell him that instead of 56 grams, she would only be able to sell him 28 grams. The pair again used coded language, with Kennedy advising that "I'm only going to be able to get the pants, not the . . . jacket too, not until Friday at least," to which CI1 responded, "The pants is just a 28?" App. 533. Approximately two hours later, Baker called Kennedy and they had the following conversation, which was again intercepted by wiretap:

> KENNEDY: Yes.
>
> BAKER: Yeah I'll be able to do that.

---

[5] CI1 testified that in his conversations with Kennedy, they used code words like "kids not dressed" and "clothes" to refer to the proposed heroin transaction.

KENNEDY: Oh, you will?

BAKER: Yup.

KENNEDY: Ok. Thank you that's a good look cause I, I really needed, I needed that to happen.

BAKER: Alright.

KENNEDY: I appreciate it. So I'll talk to you tomorrow about twelve, twelve thirty, ok?

BAKER: Yeah.

KENNEDY: Alright.

*Id.* at 187–88, 534–35. Five minutes after her conversation with Baker, Kennedy texted CI1 saying, "I got the pants and jacket," thus confirming that she would be able to sell him the full amount of heroin requested—56 grams. Gov't App. 64; *see also* App. 113–14.

On Wednesday, May 20, Kennedy and CI1 were scheduled to meet at the Shopping Plaza at approximately noon or 1 P.M. for the sale of 56 grams of heroin. Baker called Kennedy at 12:41 P.M. and said, "Yeah I'm almost to you, I'll be there in like two minutes." App. 536–37. Twenty minutes later, at 1:01 P.M., CI1 texted Kennedy to say, "I'm here r u by tj maxx" and Kennedy responded, "No. Be there in 10." Gov't App. 66. When Kennedy arrived at the Shopping Plaza, she was driving a car registered to Baker. Law enforcement agents observed Baker exit that vehicle, and walk into T.J. Maxx. Kennedy then drove

9

approximately 25 or 30 yards away to a meeting place in the parking lot where she sold 49.8 grams of a substance containing fentanyl to CI1 and CI2. After completing the sale, Kennedy drove back towards T.J. Maxx, parked, and walked into the same T.J. Maxx store that Baker had entered moments before.

## IV. The Arrests

On Monday, June 15, 2015, Kennedy and CI1 agreed to meet the next day at 1:00 P.M. in the Shopping Plaza. Kennedy agreed to sell CI1 two ounces of heroin on Tuesday and another two ounces on Thursday. On Tuesday, Kennedy and Baker arrived at the Shopping Plaza in a car registered to Baker. Upon arrival, Kennedy dropped Baker off at the T.J. Maxx. Kennedy then proceeded to her meeting with CI1 and CI2, but she was arrested in the parking lot before she was able to complete the sale.[6] Baker was arrested soon after that, as he was exiting the T.J. Maxx store.

## V. The Trial and Jury Verdict

Trial commenced on December 15, 2015. Baker did not put on a defense case. After deliberating for approximately three hours, the jury returned a guilty

---

[6] At the time of her arrest, Kennedy had in her possession 55.9 grams of a substance containing heroin.

verdict on December 18, 2015. In addition to determining that Baker participated in a conspiracy to distribute drugs, the jury also made a finding that it was reasonably foreseeable to Baker that the conspiracy involved 100 grams or more of heroin. The district court polled the jury and each juror confirmed the verdict.

## VI.    Post-Trial Proceedings

By letter dated December 28, 2015, Baker moved *pro se* for a judgment of acquittal pursuant to Rule 29 and for a new trial pursuant to Rule 33. Fed. R. Crim. P. 29, 33. Then, about five weeks after the jury verdict, on January 25, 2016, Juror No. 10 left a voicemail for Baker's trial counsel, Arthur Frost. Juror No. 10 followed-up with an email to Frost a few days later expressing "several concerns" that "perhaps . . . will be helpful to you and your client." *Id.* at 70–71. Among other things, Juror No. 10 advised as follows:

> The jury was instructed on several occasions to "keep an open mind" and not discuss the case among themselves until it received the case from the Court. This did not happen. There was discussion among many of the jurors during virtually every break. And after the verdict was rendered I overheard one juror say that he knew the defendant was guilty the first time he saw him (before he was sworn in as a juror).

*Id.* at 70. Frost scheduled a meeting with Juror No. 10. On the day of the scheduled meeting, however, Frost notified the district court that he planned to meet with Juror No. 10 later that evening, and sought "further guidance from the

11

Court on how to proceed." App. 556. The district court asked the parties to brief the issue and Frost cancelled his meeting pending the district court's decision on his application for leave to obtain an affidavit from Juror No. 10 for presentation to the district court.

On April 12, 2016, the district court denied Baker's "application for permission to inquire further of the jurors about whether the jury engaged in premature deliberations, or if a juror lied during *voir dire*." Special App. 8–9. The district court stated "[t]he proffered resulting testimony would be inadmissible for purposes of challenging the validity of the verdict, see Fed. R. Evid. 606(b), and any further inquiry in the manner suggested by Defendant would be futile." *Id.* On May 5, 2016, the district court denied Baker's Rule 33 motion for a new trial and Rule 29 motion for a judgment of acquittal, concluding *inter alia* that "[v]iewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime of conviction proved beyond a reasonable doubt." *Id.* at 14. Sentencing was held on August 10, 2016. The district court imposed a term of imprisonment of 180 months, to be followed by eight years of supervised release.

## DISCUSSION

On appeal, Baker first argues that the evidence was insufficient as a matter of law to support his conviction. Next, Baker argues that the district court erred in denying his application to conduct post-verdict juror interviews. We address each argument in turn.

### I. Sufficiency of the Evidence

We agree with the district court that the evidence presented at trial was sufficient to show that Baker conspired to distribute more than 100 grams of heroin. We review sufficiency of evidence challenges *de novo*, but defendants face "a heavy burden, as the standard of review is exceedingly deferential." *Brock*, 789 F.3d at 63 (citation omitted). "[W]e must view the evidence in the light most favorable to the [g]overnment, crediting every inference that could have been drawn in the [g]overnment's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Id.* (internal quotation marks, brackets, and citation omitted). And "[w]e will sustain the jury's verdict if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Pierce*, 785 F.3d 832, 838 (2d Cir. 2015) (citation omitted) (emphasis in original).

Baker's sufficiency of evidence challenge is meritless. Kennedy testified that she sold heroin several times in 2015; Baker was her supplier and he physically handed heroin over to her at her house; Baker sometimes accompanied her when she met CI1 and CI2 to sell them heroin; and Baker kept 90% of the proceeds from all of her sales. Because a federal conviction "may be supported by the uncorroborated testimony of even a single accomplice . . . if that testimony is not incredible on its face," Kennedy's testimony alone was sufficient to convict Baker. *United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990). Baker argues that Kennedy's "self-serving testimony" was uncorroborated and should be rejected as "incredible on its face" because she "received an extraordinarily cushy deal despite her extensive criminal history, her prior drug dealing, and her lying to the police and under oath." Def.-Appellant Br. 23–24. But this argument amounts to challenging Kennedy's "credibility based on [her] plea agreement[] with the government and [her] long histor[y] of criminal and dishonest behavior," and "simply repeats facts and arguments already presented to the jury." *United States v. Florez*, 447 F.3d 145, 156 (2d Cir. 2006). During Kennedy's cross-examination, Baker's trial counsel focused almost exclusively on providing the jury with examples of Kennedy's dishonesty, noting inconsistencies in Kennedy's

14

testimony, and explaining Kennedy's incentives to testify untruthfully. Baker's trial counsel also used a significant portion of his closing statement to expound upon how "Kennedy is a liar," referring to Kennedy as "Kandi the liar." *See* Dec. 18, 2015 Trial Tr. 547–54, 557–58, 560–61, *United States v. Baker*, No. 15-cr-258 (N.D.N.Y. Sept. 29, 2016), ECF No. 81. "We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge," particularly when, as is the case here, trial counsel already presented these same credibility arguments to the jury. *Florez*, 447 F.3d at 156 (citations omitted).

Furthermore, even if corroborating evidence were necessary (and it is not), there was in fact ample corroborating evidence here to support the potential "inference[s] that the jury may have drawn in the government's favor" on the basis of Kennedy's testimony alone. *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008) (internal quotation marks omitted); *see also Brock*, 789 F.3d at 63 ("[W]e must . . . credit[] every inference that could have been drawn in the [g]overnment's favor, and defer[] to the jury's . . . assessment of the weight of the evidence." (citation omitted)). Thus, the jury could have concluded that the following evidence supported Kennedy's account of her dealings with Baker: Baker's presence in the vicinity of at least three drug transactions; the use of a car

15

registered to Baker in at least three transactions; the similar timing and location of the other transactions; the suspicious timing of calls between Baker and Kennedy; and the suggestive content of their communications. Such evidence, considered as a whole, provided the jury with ample additional reason, beyond its consideration of Kennedy's testimony, to conclude that this testimony was credible. *See Brock*, 789 F.3d at 63 ("[W]e must . . . defer[] to the jury's assessment of witness credibility." (citation omitted)). Accordingly, we uphold the jury's verdict because a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Pierce*, 785 F.3d at 838.

## II. Post-Trial Juror Interviews

We also uphold the district court's decision to deny Baker's request to interview jurors approximately five weeks after the jury verdict. We review a trial judge's handling of alleged jury misconduct for abuse of discretion. *United States v. Sabhnani*, 599 F.3d 215, 250 (2d Cir. 2010). As we have repeatedly said, a post-verdict inquiry into allegations of such misconduct is only required "when there is clear, strong, substantial and incontrovertible evidence . . . that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983) (citation

16

omitted); *see also United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989).

Allegations of impropriety must be "concrete allegations of inappropriate conduct

that constitute competent and relevant evidence," though they need not be

"irrebuttable [because] if the allegations were conclusive, there would be no need

for a hearing." *Ianniello*, 866 F.2d at 543. "It is up to the trial judge to determine

the effect of potentially prejudicial occurrences," *United States v. Vitale*, 459 F.3d

190, 197 (2d Cir. 2006) (citation omitted), and the "trial judge has broad flexibility

in responding to allegations of [juror] misconduct, particularly when the incidents

relate to statements made by the jurors themselves, rather than to outside

influences," *Sabhnani*, 599 F.3d at 250 (internal quotation marks omitted).

Here, the district court properly proceeded with caution when determining

whether to permit juror interviews. Baker argues that a post-trial inquiry was

required based on two allegations in Juror No. 10's page-and-a-half long email:

- Allegation No. 1: "The jury was instructed on several occasions to 'keep an open mind' and not discuss the case among themselves until it received the case from the Court. This did not happen. There was discussion among many of the jurors during virtually every break." Gov't App. 70; *see also* Def.-Appellant Br. 31.

- Allegation No. 2: "[A]fter the verdict was rendered I overheard one juror say that he knew the defendant was guilty the first time he saw him (before he was sworn in as a juror)." Gov't App. 70; *see also* Def.-Appellant Br. 31.

17

Baker argues that the first allegation shows that the jurors impermissibly engaged in premature deliberations, perhaps "involv[ing] the introduction of truly extraneous materials into the juror process," Def.-Appellant Br. 37, and that the second demonstrates that a juror could have been "convinced from the outset of Baker's guilt based on racial stereotypes or animus," *id.* at 36. For the following reasons, we are not persuaded.

At the start, both of these allegations relate to "statements made by the jurors themselves, rather than to outside influences," and, as noted above, we have made clear that trial judges have particularly "broad flexibility in responding to allegations of such misconduct." *Sabhnani*, 599 F.3d at 250 (internal quotation marks omitted). Moreover, the brief email excerpts on which Baker relies are not even a prominent feature of Juror No. 10's lengthy email communication, which makes numerous observations about the trial, ranging over many topics, but at no point suggests that the jury reached the wrong verdict or that Juror No. 10 was in any way influenced by either premature deliberations or juror bias.[7] Because

---

[7] In fact, Juror No. 10 references specific evidence in the form of an intercepted telephone call between Baker and Kennedy in explaining his vote to convict: "It came down to two sentences attributed to Mr. Baker in the last call we heard between he and Ms. Kennedy: 'I got the stuff. I can make it happen.' That didn't leave wiggle room." Gov't App. 71.

18

courts are wary of the "evil consequences" likely to result from post-verdict inquiries—"subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts"—such inquiries are not undertaken in the absence of reasonable grounds. *Ianniello*, 866 F.2d at 543; *see also Moon*, 718 F.2d at 1234 (requiring "clear, strong, substantial and incontrovertible evidence that a *specific non-speculative* impropriety has occurred" (emphasis added)); *United States v. Moten*, 582 F.2d 654, 667 (2d Cir. 1978) (noting "unexceptional proposition" that convicted defendants "should not be allowed to . . . inconvenience jurors merely to conduct a fishing expedition"). We cannot conclude that the district court abused its discretion in determining that Juror No. 10's email did not present sufficient reason for further inquiry and additional contact with jurors.

Thus, regarding the first excerpt on which Baker relies, Juror No. 10 avers that the jurors failed to follow the district court's instruction to "keep an open mind and not discuss the case among themselves" because "[t]here was discussion among many of the jurors during virtually every break." Gov't App. 70. However, Juror No. 10 says nothing about the content of those discussions.

19

Baker surmises that the conversations amounted to premature deliberations, but "[n]ot every comment a juror may make to another juror about the case is a discussion about a defendant's guilt or innocence that comes within a common sense definition of deliberation." *United States v. Peterson*, 385 F.3d 127, 135 (2d Cir. 2004); *see also United States v. Morales*, 655 F.3d 608, 629, 632 (7th Cir. 2011) (post-verdict juror note alleging some jurors violated the district court's instruction not to discuss the case among themselves prior to deliberations "only suggested the possibility of premature deliberations (as opposed to jokes, idle comments, or other generalized discussions)"); *Sabhnani*, 599 F.3d at 249 (affirming denial of post-verdict interview because a "potentially out-of-context, single word comment, does not demonstrate that the jurors prematurely deliberated and does not demonstrate that the juror would be unreceptive to opposing arguments or that any juror failed to participate in deliberations in good faith" (internal quotation marks and brackets omitted)).[8]  Moreover, even assuming, *arguendo*, that premature deliberations occurred, we agree with the district court that Rule 606(b) of the Federal Rules of Evidence prohibited the jurors from impeaching

---

[8] *See also United States v. Annabi*, 560 F. App'x 69, 73–74 (2d Cir. 2014) (summary order) (affirming denial of post-verdict interview where one juror wrote a letter disclosing that jurors spoke about the case during lunch).

their verdict by testifying about the effect of such deliberations on the verdict, rendering the inquiry futile from the start.[9]  *See United States v. Leung*, 796 F.3d 1032, 1036 (9th Cir. 2015) (concluding that Rule 606(b) prohibits post-trial inquiry of jurors into effect of premature deliberations because such an inquiry "intrudes upon jurors' mental processes concerning the verdict" and "how jurors considered the evidence or their mental states while hearing testimony" (internal quotation marks omitted)); *Morales*, 655 F.3d at 631 (concluding that "[a]ny [post-verdict] inquiry as to bias arising from the alleged premature deliberations would run afoul of [Rule 606(b)'s] clear proscription" and would thus be "fruitless" (internal quotation marks omitted)); *cf. United States v. Richards*, 241 F.3d 335, 343 (3rd Cir.

---

[9] The no-impeachment rule and its exceptions are codified as Rule 606(b) of the Federal Rules of Evidence:

> (1) Prohibited Testimony or Other Evidence.   During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.   The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

> (2) Exceptions.   A juror may testify about whether:

>> (A) extraneous prejudicial information was improperly brought to the jury's attention;

>> (B)  an outside influence was improperly brought to bear on any juror; or

>> (C)  a mistake was made in entering the verdict on the verdict form.

Fed. R. Evid. 606(b).

21

2001) (finding no abuse of discretion in denying motion for a new trial based on juror's post-trial affidavit attesting that he "overheard two jurors comment in the presence of other jurors and prior to the close of the evidence that they believed [the defendant] was guilty" because inquiry into "whether or not the premature statements affected their verdict" would be prohibited by Rule 606(b)).

Baker attempts to avoid this conclusion by speculating that discussion among jurors during trial could have involved "the introduction of truly extraneous materials into the juror process." Def.-Appellant Br. 37 (referencing an exception to the general no-impeachment rule set out in Federal Rule of Evidence 606(b)(2)(A)). But he provides no basis for the conclusion that extraneous materials were introduced to the jury. And we have rejected speculative claims of this sort as insufficient on many past occasions. *See, e.g.*, *King v. United States*, 576 F.2d 432, 438 (2d Cir. 1978) (concluding that an evidentiary hearing was not required because "weakly authenticated, vague, and speculative material" constituted a "frail and ambiguous showing").[10]

---

[10] *See also United States v. Cartelli*, 272 F. App'x 66, 69–70 (2d Cir. 2008) (summary order) (affirming district court's decision not to inquire further because "the court was presented with mere speculation as to what sort of conversations the jurors may have had with their wives").

22

Along the same lines, Baker speculates that Juror No. 10's second allegation, that an unnamed juror stated after the verdict that he "knew the defendant was guilty the first time he saw him (before he was sworn in as a juror)," *could possibly indicate* that the juror determined Baker's guilt "based on racial stereotypes or animus," Def.-Appellant Br. 36, given that "[Baker] appeared non-white," Def.-Appellant Reply Br. 18. He seeks to invoke the Supreme Court's recent decision in *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017), which recognized that when a juror "makes a clear statement that indicates that he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." But Baker's invocation of *Peña-Rodriguez* is to no avail.[11]

First, *Peña-Rodriguez*, by its terms, is inapposite. *Peña-Rodriguez* recognized a narrow exception to the no-impeachment rule: When a juror has made a "*clear statement* that indicates he or she relied on racial stereotypes or animus to convict

---

[11] Baker did not argue below that Juror No. 10's email suggested that racial bias motivated the verdict and the government contends that we should review this claim only for plain error. We need not address the point, however, as we conclude that affirmance is appropriate under either potentially applicable standard of review.

a criminal defendant"—that is, a statement "exhibiting *overt* racial bias that cast[s] serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict"—a trial court may consider evidence of that juror's statement, even when proffered by other jurors. *Id.* (emphases added); *see also id.* (noting that "[n]ot every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry"); *Young v. Davis*, 860 F.3d 318, 333 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 656 (2018) (describing *Peña-Rodriguez* exception as a "constrained relaxing" that only applies "narrowly"); *United States v. Robinson*, 872 F.3d 760, 764 (6th Cir. 2017) (describing *Peña-Rodriguez* exception as applicable only "in very limited circumstances"). *Peña-Rodriguez* thus sets forth a limited circumstance in which the Constitution requires an exception to the rule that jurors will not be heard to impeach their own verdicts. But *Peña-Rodriguez* does not address the separate question of what showing must be made before counsel is permitted to interview jurors post-verdict to inquire into potential misconduct. Indeed, as to this question, the decision simply reaffirms the importance of *limits* on counsel's post-trial contact with jurors "to provide [them] some protection when they return to their daily affairs after the verdict has been entered." *Peña-Rodriguez*, 137 S. Ct. at 869; *see also id.* at 865

24

("[T]he no-impeachment rule has substantial merit [because i]t . . . provid[es] jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict").

Next, Juror No. 10's allegation that an unnamed juror said, "he knew the defendant was guilty the first time he saw him," without more, does not constitute clear, strong, and incontrovertible evidence that this juror was animated by racial bias or hostility, providing reasonable grounds for further inquiry. Crediting Baker's speculative conclusion to the contrary would run counter to our presumption that "jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court." *United States v. Rosario*, 111 F.3d 293, 300 (2d Cir. 1997) (citation omitted). Here, after administering the oath to jurors, the district court specifically instructed the jury to "decide the case based on what you hear and see in the courtroom," to "keep an open mind until you have heard all the evidence in this case and the [c]ourt's charge on the law," and to remember that "[t]he defendant . . . starts out the trial with a clean slate." Dec. 15, 2015 Trial Tr. at 13–17, *United States v. Baker*, No. 15-cr-258 (N.D.N.Y. Sept. 29, 2016), ECF No. 78. As *Peña-Rodriguez* itself made clear, such instructions help ensure that the

exception to the no-impeachment rule that it recognized would be "limited to rare cases." 137 S. Ct. at 871. Baker has not come close to showing that his case falls within this category.

Finally, we observe that Baker's trial counsel properly notified the district court and the government prior to inquiring further of Juror No. 10. "[I]t always lies within the province of the district judge to take full control of the [post-verdict interviewing of jurors] when it is first brought to his attention." *Moten*, 582 F.2d at 666. The district court exercised "sound discretion" in determining that further inquiry was unnecessary. It thus did not err in denying Baker's request to interview jurors. Juror No. 10's email did not provide sufficient evidence to trigger mandatory post-trial juror interviews because Juror No. 10's email did not constitute "clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety ha[d] occurred." *Ianniello*, 866 F.2d at 543.

## CONCLUSION

We have considered all of Baker's remaining arguments and find them to be meritless. For the foregoing reasons, Baker's judgment of conviction is AFFIRMED.

26