19-3081-cr(L)
*United States v. Campbell, Peter, Syder*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007 IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 8th day of April, two thousand twenty-one.

PRESENT:
> BARRINGTON D. PARKER,
> GERARD E. LYNCH,
> JOSEPH F. BIANCO,
> *Circuit Judges*.

------

United States of America,

> *Appellee*,

> v.

19-3081-cr(L), 19-3098-cr(CON),
19-3170-cr(CON)

Jason Campbell, AKA Holiday, AKA Fish, Sean Peter, AKA Huggie, Steven Syder, AKA Esteban,

> *Defendants-Appellants*.

------

FOR APPELLEE:

SAGAR RAVI, Assistant United States Attorney (Christopher J. Clore, Jacqueline C. Kelly, Karl Metzner, Assistant United States Attorneys, *on the brief*), *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, NY.

FOR DEFENDANT-APPELLANT
JASON CAMPBELL:

JOSHUA L. DRATEL, Law Offices of Joshua L. Dratel, P.C., New York, NY (Avraham C. Moskowitz, Christopher R. Neff, Moskowitz & Book, LLP, New York, NY *on the brief*).


FOR DEFENDANT-APPELLANT
SEAN PETER:

BOBBI C. STERNHEIM, (Alex S. Huot, *on the brief*), Law Offices of Bobbi C. Sternheim, New York, NY.


FOR DEFENDANT-APPELLANT
STEVEN SYDER:

DONALD JOSEPH YANNELLA III, Donald Yannella P.C., New York, NY.


Appeal from judgments of the United States District Court for the Southern District of New York (Buchwald, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgments of the district court are **AFFIRMED**.

Defendants-Appellants Jason Campbell, Sean Peter, and Steven Syder appeal from judgments of conviction, entered September 18, 2019 as to Campbell and Peter, and September 19, 2019 as to Syder, following a seven-day jury trial in the United States District Court for the Southern District of New York (Buchwald, *J.*). Campbell, Peter, and Syder were each convicted for their roles in a marijuana distribution conspiracy and in the October 2, 2012 murder of Brian Gray in the Bronx, New York. Specifically, they were each convicted of: (1) one count of conspiracy to possess and distribute marijuana, in violation of 21 U.S.C. §§ 841 and 846; (2) one count of murder through the use of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(j); and (3) one count of using a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). Campbell and Peter were each sentenced

2

principally to twenty-three years' imprisonment and three years of supervised release, and Syder was sentenced principally to twenty years' imprisonment and three years of supervised release.

We assume the parties' familiarity with the underlying facts and procedural history of this case, which we reference only as necessary to explain our decision to affirm.

## I. The Sufficiency of the Evidence

Appellants assert that the evidence adduced at trial was insufficient to convict them on any of the counts in the indictment. In particular, they argue that the government failed to prove that (1) they knowingly participated in the charged marijuana conspiracy and (2) Gray's murder was during and in relation to, or in furtherance of, that conspiracy.

We review *de novo* challenges to the sufficiency of the evidence. *United States v. Requena*, 980 F.3d 30, 43 (2d Cir. 2020). "In so doing, we view the evidence in the light most favorable to the [g]overnment with all reasonable inferences resolved in the [g]overnment's favor." *Id.* "We therefore 'assum[e] that the jury resolved all questions of witness credibility . . . in favor of the prosecution.'" *Id.* (alteration in original) (quoting *United States v. Abu-Jihaad*, 630 F.3d 102, 134 (2d Cir. 2010)). Thus, defendants challenging the sufficiency of trial evidence "'face a heavy burden[]' because our framework for evaluating such challenges 'is [so] exceedingly deferential.'" *United States v. Ho*, 984 F.3d 191, 199 (2d Cir. 2020) (quoting *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018)). In short, a conviction must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

"To affirm a conviction for conspiracy to distribute under [21 U.S.C. §] 846, the record must support a rational jury's finding (1) the existence of the conspiracy charged; (2) that the

3

defendant had knowledge of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *United States v. Barret*, 848 F.3d 524, 534 (2d Cir. 2017) (internal quotation marks omitted). The evidence at trial was ample to permit the jury to find that all three appellants participated in a conspiracy to distribute marijuana headed by Peter's brother Shane "Streets" Peter (hereinafter, "Streets").

To begin, multiple witnesses testified that Streets was known to sell marijuana at various places in the neighborhood involved in this case, including an apartment at 3233 Olinville Avenue (the "Stash House"), a nearby park, and a local corner store (the "Corner Store"). The trial evidence included the testimony of cooperating witness Larice Robinson, who was one of Streets's customers and purchased drugs from him in various neighborhood locations, including the first floor of Robinson's residence, where the Stash House was located. Another witness, Julian Martinez, also testified that Streets sold relatively large quantities of marijuana, such as "quarter pounds[] [and] pounds." Suppl. App'x at 267. In addition, the jury heard testimony from New York City Police Department ("NYPD") Sergeant Peter Curran that the NYPD investigated Streets's marijuana operation only a few months before Gray's murder, and that he observed over two ounces of marijuana, as well as "a scale that could measure approximately 5,000 grams," in the Stash House. *Id.* at 244.

The trial evidence was also sufficient to prove that each of the three appellants joined with Streets in the marijuana operation. As a threshold matter, to the extent that appellants suggest that the sufficiency analysis as to their involvement in the marijuana conspiracy should not include the circumstances surrounding their participation in Gray's murder, we disagree. In *United States v. Santos*, we explained:

4

> An unlawful act committed in furtherance of a drug conspiracy . . . is not itself the drug conspiracy or any element thereof. But such acts—including killings—may and often do serve as powerful circumstantial evidence that the charged conspiracy existed and that the actor joined it.

541 F.3d 63, 69 (2d Cir. 2008); *see also id*. at 72 ("Because narcotics conspiracies are illicit ventures, disputes are frequently settled by force or the threat of force. Consequently, advancing the aim of a narcotics conspiracy can involve performing ancillary functions such as enforcing discipline and chastising rivals." (alterations, citations, and internal quotation marks omitted)). As set forth below, we find that the evidence, when viewed in its totality and in the light most favorable to the government, was sufficient to convict each of the appellants for their role in the marijuana distribution conspiracy.

With respect to Peter, there was testimony from several witnesses and other corroborating evidence from which the jury could rationally infer he was an active participant in Streets's marijuana conspiracy. For example, cooperating witness Robinson testified that he had purchased marijuana from Peter on occasion, and that when he could not contact Streets, he would call Peter who would help Robinson get in touch with Streets. Further, the jury heard testimony from which it could find that when, a few weeks before Gray's murder, Gray and Martinez attempted to rob Streets's Stash House, Peter followed them, and then confronted and threatened them twice in an effort to deter such conduct, nearly getting shot by Martinez, whose gun malfunctioned, in the process.

In addition, the government presented extensive evidence concerning Peter's involvement, along with his co-appellants, in Gray's murder on October 2, 2012. Given the timing of this murder (only around two weeks after the failed robbery of the Stash House), as well as the

5

circumstances surrounding the murder itself, it was reasonable for the jury to infer that Peter's participation in the murder (and the participation of his co-appellants) reflected their commitment to the marijuana conspiracy, including undertaking efforts to protect it. Specifically, the jury heard eyewitness testimony and observed video surveillance footage from which it could conclude that—after Syder had identified Gray at a local deli—Peter, along with Campbell and Syder, gathered handguns from trashcans near Peter's apartment, followed Gray and his friends to a nearby block where they were hanging out and drinking beer, and each opened fire on them, killing Gray and injuring two others. The evidence also established that Peter was shot in the arm, and that, after the shooting, all three appellants returned to Peter's apartment.

Further, the trial evidence demonstrated that Robinson helped Peter, as well as Campbell and Syder, flee the Bronx after the shooting, and brought them from Peter's apartment to a hospital in Teaneck, New Jersey, so Peter could receive treatment for his wounded arm.[1] Moreover, when Peter, Campbell, and Syder left Peter's apartment to get into Robinson's van, Peter brought a black duffle bag with him. After a police officer searched Robinson's van at the hospital, he found that the bag contained "$3,674 [in cash], over a pound of marijuana, a digital scale, Ziploc baggies, ammunition—loose ammunition, as well as empty shells—multiple fraudulent IDs and credit cards with various names on [them] and two black cell phones." Suppl. App'x at 188. Ballistics evidence showed that bullets found in the bag matched those used in the Bronx shooting. As is clear from the foregoing, there was a great deal of evidence from which the jury could find that

---

[1] Notably, at the hospital, Peter provided police officers a fake name and claimed that he had been shot while at a party in Paterson, New Jersey. Campbell and Syder also falsely told police officers that Peter had been shot at the party.

Peter not only sold, and helped facilitate sales of, marijuana as part of the conspiracy run by Streets, but also acted as "muscle" by following and threatening Gray and Martinez when they attempted to rob the Stash House, and ultimately by participating in Gray's murder. *See United States v. Arrington*, 941 F.3d 24, 37 (2d Cir. 2019) (finding that evidence was sufficient to convict defendant of narcotics conspiracy charge, in part, because "a reasonable jury could have found that [defendant's] role and offers to serve as 'muscle' assisted his co-conspirators' drug trafficking activities"). Thus, the trial evidence was sufficient to sustain Peter's marijuana conspiracy conviction.

With respect to Campbell, there was likewise more than sufficient evidence for the jury to convict him for his role in Streets's marijuana conspiracy. The government presented evidence that, after selling marijuana to an undercover police officer only half a block from the Stash House in February 2012—just eight months before Gray's murder—Campbell was arrested in front of the Stash House with Streets, who was found to be in possession of marijuana.[2] Moreover, video surveillance evidence supported the inference that, prior to Gray's murder, Campbell joined Syder in tracking Gray and his friends. Further, as described above in relation to Peter, there was ample evidence from which the jury could conclude that Campbell actively participated, along with Peter

---

[2] Campbell's contention that the district court erred in admitting his February 2012 arrest and conviction for selling marijuana into evidence is unavailing. Even assuming that he preserved his objection to the admission of this evidence, and notwithstanding the government's mistaken representation to the district court that Campbell sold marijuana in front of the Stash House, rather than half a block away, we find that the district court did not abuse its discretion in admitting such highly probative, direct evidence of Campbell's involvement in Streets's marijuana conspiracy. *See United States v. McGinn*, 787 F.3d 116, 127 (2d Cir. 2015) ("We review a district court's evidentiary rulings under a deferential abuse of discretion standard, and we will disturb an evidentiary ruling only where the decision to admit or exclude evidence was manifestly erroneous." (internal quotation marks omitted)).

and Syder, in Gray's murder and the subsequent attempted getaway to New Jersey. Indeed, after the group arrived at the hospital in Teaneck and Syder accompanied Peter inside, Peter left the duffle bag containing significant evidence of drug and gun crimes (including over $3,000 in cash) in Campbell's custody, Campbell instructed Robinson to tell the police that they had picked Peter up at a party in Paterson, and Campbell himself told a police officer that he had come from the Bronx to pick up friends at that party. This evidence is sufficient to permit a rational jury to conclude beyond a reasonable doubt that Campbell was acting in concert with Peter and Syder in connection with the marijuana conspiracy and that he was a trusted member of their group. *See, e.g.*, *United States v. Anderson*, 747 F.3d 51, 69 (2d Cir. 2014) ("First, the fact that conspirators intended to commit highly valuable contraband to the defendant's sole custody and control provides important evidence of a trust relationship between the defendant and other conspirators. Second, and relatedly, jurors may infer a defendant's knowledge of the object of a conspiracy— e.g., to possess and distribute drugs—where there is evidence of such a trust relationship."); *United States v. Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2002) ("A defendant's knowing and willing participation in a conspiracy may be inferred from . . . evidence that [he] . . . possessed items important to the conspiracy . . . ."). Accordingly, we conclude that the government's evidence was sufficient to sustain Campbell's marijuana conspiracy conviction.

As to Syder, the only pre-murder evidence the government proffered related to Syder's role in Streets's marijuana conspiracy was Robinson's testimony that he had seen Syder at the Corner Store—a known "weed spot," Suppl. App'x at 252—and around the neighborhood with Peter and Campbell. On its own, such evidence is insufficient to convict Syder for his involvement in the charged marijuana conspiracy. However, the jury was also entitled to consider Syder's key role

in Gray's murder in determining whether he was a knowing member of the marijuana conspiracy. *See Santos*, 541 F.3d at 73 ("That [defendant] did not participate in the narcotics conspiracy in some way other than carrying out the murder[] does not undermine the sufficiency of the evidence that he was a co-conspirator."). In particular, there was evidence from which the jury could infer that Syder was the first appellant to identify Gray at a local deli where Gray had gone with his friends to buy beer and snacks shortly before his murder early in the morning of October 2, 2012, and that Syder then notified Peter and Campbell that he had come across Gray. Additionally, Syder—who was wearing distinctive white sweatpants on the night of Gray's murder—was identified as the person leading the armed charge toward Gray and his friends and as being the first to fire his gun at the group. Furthermore, at the hospital, Syder told local police the same lie as had Peter and Campbell—that Peter had been shot at a party in Paterson. Similarly, the post-murder flight by Syder (along with Peter and Campbell) with the getaway bag of marijuana, marijuana distribution tools, cash, and ammunition linked to the murder provided additional circumstantial evidence of Syder's involvement not only in the murder, but also the marijuana conspiracy. Moreover, as the district court noted in denying appellants' motions for acquittal under Federal Rule of Criminal Procedure 29, the acknowledgment by Syder and Campbell that they shared a single cellphone also "supported the inference that they were trusted colleagues with common business interests." Joint App'x at 131. In short, although the evidence supporting Syder's involvement in Streets's marijuana conspiracy is not as strong as it is for Peter and Campbell, we find that it is sufficient to sustain his conviction on that charge.

Finally, we conclude that the trial evidence was also sufficient to convict each appellant on the murder count under 18 U.S.C. § 924(j) and the firearms count under 18 U.S.C. § 924(c)(1)(A).

9

To convict a defendant under Section 924(j), the government must prove "that during and in relation to [an] underlying [drug trafficking] offense [the defendant] knowingly used or carried a firearm" and, with that firearm, murdered someone. *United States v. Wallace*, 447 F.3d 184, 187 (2d Cir. 2006). Similarly, with respect to Section 924(c)(1)(A), to sustain a conviction the government must show that the defendant knowingly possessed a firearm in furtherance of a drug trafficking crime. *See United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001) ("[T]he requirement in § 924(c)(1) that the gun be possessed in furtherance of a drug crime may be satisfied by a showing of some nexus between the firearm and the drug selling operation [at issue]."); *see also United States v. Snow*, 462 F.3d 55, 62–63 (2d Cir. 2006) ("[A] drug dealer may be punished under § 924(c)(1)(A) where the charged weapon is readily accessible to protect drugs, drug proceeds, or the drug dealer himself.").

The same evidence outlined above in connection with the marijuana conspiracy, as well as the evidence summarized in the thorough analysis by the district court, provided a sufficient basis for the jury to rationally find that each appellant participated in the shooting of Gray with knowledge that the murder was in furtherance of Streets's marijuana conspiracy—namely, as punishment for his attempted robbery of Streets's Stash House and to send a message that such affronts to his marijuana operation would not be tolerated. *See Santos*, 541 F.3d at 72 ("Violence [such as a murder can] further[] [the goals of a drug] conspiracy . . . by sending the message that those suspected of stealing from the conspiracy w[ill] be treated harshly." (internal quotation marks omitted)). As the district court explained:

> The defendants' comingling of additional contraband with the ammunition unquestionably connected to all three of them in the single bag that they took with them on their joint flight supported the inference that they understood the bag's

10

contents to be part of an integrated criminal enterprise. . . . Considering this evidence together with, *inter alia*, the background knowledge and affiliations of the defendants, the close temporal proximity of the murder and Gray's thwarted robbery attempt, the targeting of Gray (as initiated by Campbell and Syder) rather than Martinez, the manifest level of trust that the defendants displayed in one another, the enthusiasm with which each of them participated in the murder, and the business-like synchronization of their plotting, execution, and flight, no more was needed to convince a reasonable jury not only that the defendants had murdered or aided and abetted the murder of Brian Gray by means of a firearm, but that each of them had done so with knowledge that the murder was connected to the marijuana conspiracy.

Joint App'x at 132–33.   We agree.

In sum, we find that the evidence adduced at trial, when "view[ed] . . . in the light most favorable to the [g]overnment," *Requena*, 980 F.3d at 43, was sufficient to convict each appellant on all counts.

## II.    Alleged Prosecutorial Misconduct

Appellants also contend, as they did before the district court, that they should be granted a new trial in light of numerous instances of alleged prosecutorial misconduct during the government's opening and rebuttal summations.   Specifically, appellants assert that their trial was unfair and that they should be granted a new trial because, *inter alia*, the government stated that there was no dispute that Peter and two other men murdered Gray, made numerous unsupported comments regarding the trial evidence, and manipulated the time stamps on certain PowerPoint slides purporting to reflect video surveillance evidence introduced at trial.[3]

---

[3]   In general, we review a district court's denial of a motion for a new trial for abuse of discretion, *United States v. DiTomasso*, 932 F.3d 58, 70 (2d Cir. 2019), but insofar as Campbell, Peter, and Syder failed to object to certain instances of the government's alleged misconduct at trial, "the plain error standard applies," *United States v. Williams*, 690 F.3d 70, 75 (2d Cir. 2012).   We need not go any further in drawing this distinction, however, because appellants' arguments that their trial was unfair due to alleged prosecutorial misconduct fail under either standard.

11

"[A] defendant who seeks to overturn his conviction based on alleged prosecutorial misconduct in summation bears a 'heavy burden.'" *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (quoting *United States v. Feliciano*, 223 F.3d 102, 123 (2d Cir. 2000)). "Flaws in the government's summation will require a new trial only in the rare case in which improper statements—viewed against the entire argument to the jury—can be said to have deprived the defendant of a fair trial." *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010); *accord Farhane*, 634 F.3d at 167 (noting that defendants seeking a new trial based on alleged prosecutorial misconduct "must show that [a challenged] comment, when viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudiced him, depriving him of a fair trial" (citations and internal quotation marks omitted)). "In determining whether an inappropriate remark amounts to prejudicial error, we look to 'the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct.'" *Caracappa*, 614 F.3d at 41 (quoting *United States v. Spinelli*, 551 F.3d 159, 170 (2d Cir. 2008)).

Applying these principles here, we agree with the district court's well-reasoned decision that none of the alleged instances of prosecutorial misconduct appellants identify—individually or taken together—warrant a new trial. First, as to the government's statement at the beginning of its summation that "there is no dispute that Sean Peter and two other men murdered Brian Gray," Suppl. App'x at 327, that comment was an apparent reference to Peter's opening statement where the focus was upon the motive for the shooting, and did not appear to be an effort by the government to shift the burden of proof. More specifically, it was admitted in Peter's opening statement as to the Gray murder, that "a shootout ensued. . . . Sean Peter was shot in his right

12

forearm . . . . Brian Gray was also shot in the arm with a bullet going in one side and out the other, but it then went in[to] his chest, where it caused his death. . . . Sean and his friends then hurried back to Sean's house. They got rid of the guns." *Id.* at 147; *see also id.* at 147–48 ("The evidence will show that what happened that night was a very personal dispute between someone who members of [a] gang tried to kill and Sean and his friends."). In any event, in sustaining Peter's objection to the statement in order to avoid any concern about burden-shifting, the district court stated in open court, "Excuse me. Hold on. . . . I don't think that [defendants have] pled guilty to that. I think they pled not guilty to the entire indictment," and then cautioned the government at sidebar to "clean it up," after which the government clarified that "[t]he defendants here have pled not guilty. The burden of proving their guilt is on the government. We welcome that burden." *Id.* at 327–28. We find that such curative measures were sufficient to mitigate any potential prejudice that arose from the government's challenged statement.

Second, with respect to the various cited instances of the government's commentary on the evidence, we find that appellants were not prejudiced by such comments because, as we have long held, "[i]n summation counsel are free to make arguments which may be reasonably inferred from the evidence presented." *United States v. Roldan-Zapata*, 916 F.2d 795, 807 (2d Cir. 1990).

Third, appellants' contention that their trial was rendered unfair due to the government's statements and related PowerPoint slides concerning the timing of certain video surveillance evidence is equally unavailing. The government's use of "real time" stamps, *see, e.g.*, Joint App'x at 55–57, to reflect its view of the actual time during which footage captured by certain surveillance cameras took place was appropriate on summation, as it was supported by the testimony of NYPD Detective Green, who explained that the original time stamps on those videos

13

were incorrect.    Moreover, the district court asked the government, in the presence of the jury, "to clarify that the ['real time'] stamp[s] at the bottom [of the government's slides were] not on the original exhibit[s]," Suppl. App'x at 333, and the government proceeded to explain to the jury how it arrived at its "real time" stamps by reference to Detective Green's testimony.

As we have emphasized, "[t]he law recognizes that 'summations—and particularly rebuttal summations—are not detached exposition[s] with every word carefully constructed . . . before the event.    Precisely because such arguments frequently require improvisation, courts will not lightly infer that every remark is intended to carry its most dangerous meaning.'"    *United States v. Aquart*, 912 F.3d 1, 27 (2d Cir. 2018) (second alteration in original) (quoting *Farhane*, 634 F.3d at 167).    Simply put, this is not the "rare case in which [alleged] improper comments in a prosecutor's summation are so prejudicial that a new trial is required."    *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992) (internal quotation marks omitted).[4]

---

[4]   We also find unpersuasive Peter's assertion that the government violated its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to timely disclose Martinez's grand jury testimony until shortly before trial, and by erroneously listing him as "Victim 3" in its motion *in limine*, thereby preventing the disclosure of his prior conviction for armed robbery.    Peter Br. at 43.    It is well settled that "as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not [committed a *Brady* violation] simply because it did not produce the evidence sooner."    *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001).    As the district court correctly found, Peter was not prejudiced by these alleged *Brady* violations because Martinez's grand jury testimony was disclosed five days before trial, and his prior conviction was disclosed two weeks before trial, which provided sufficient time for the effective use of that information.

\* \* \*

We have considered all of appellants' remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgments of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court